LAMAR, Justice, for the Court:
¶ 1. Henry C. Gibson was a resident of Arnold Avenue Nursing Home (“AA”) in Greenville, Mississippi, from June 2001 until December 2002. After being hospitalized in December 2002, Gibson was moved to another nursing home and died on January 26, 2003. Gibson’s estate filed a wrongful-death action on August 24, 2004, seeking compensatory and punitive damages. The plaintiffs averred that Magnolia Healthcare, Inc., the owner of AA, and Foundation Health Services, Inc., an entity that had entered into a management and financial-services agreement with Magnolia, were negligent in causing various injuries, some of which contributed to Gibson’s death. The jury awarded $1.5 million in compensatory damages, which the trial court reduced to $500,000 for noneconomic damages and $75,000 for permanent disfigurement. The trial court refused to allow the jury to consider punitive damages.
¶2. The plaintiffs appealed, asserting two issues: (1) whether the trial court erred in refusing to allow the jury to consider punitive damages; and (2) whether the statutory cap for noneconomic damages is constitutional. We find no error in the trial court refusing to allow the jury to consider punitive damages. We find the plaintiffs failed to raise the constitutionality of the statutory cap before the trial court; thus that issue is procedurally barred.
¶ 3. AA and Foundation cross-appealed on various issues that are summarized as follows: (1) whether the trial court erred in denying Foundation’s motion for judgment notwithstanding the verdict (JNOV), because it was not a proper party; (2) whether the trial court erred in denying the defendants’ motion for JNOV on the issues of breach and causation; and (3) whether the trial court erred in denying the defendants’ motion for mistrial based on improper witness testimony and counsel’s inappropriate comments before the jury. We find that Foundation was an improper party and that the trial court should have granted its motion for JNOV. However, we find no error in any of the remaining issues raised by the Defendants.
Facts
¶ 4. Henry Gibson was seventy-one years old when his family decided to admit him to AA for care and rehabilitation following a stroke that caused paralysis to the right side of his body. As a result of the stroke and subsequent seizures, he was bedbound and incontinent throughout his residency at AA. At the time Gibson was admitted, he had difficulty communicating verbally, and he suffered from numerous medical conditions, including alcoholism, diabetes, high blood pressure, and heart problems. He was approximately 5'2" and initially weighed 181, although malnourished at the time he entered AA. Shortly after entering the nursing home, Gibson was placed on a PEG (percutaneous endoscopic gastrostomy), or feeding tube, due to difficulty swallowing. Over the course of his stay, Gibson lost approximately forty pounds.
¶ 5. On December 31, 2002, Gibson was hospitalized after experiencing difficulty breathing. During this hospitalization, it was discovered that Gibson had a collection of fluid around his left lung (hemotho-rax) and a fractured right arm. Dr. Hugh Gamble, a thoracic surgeon, drew out approximately 1,500 ccs of slightly bloody pleural fluid, and later, an additional 500 ccs of primarily blood. Dr. Gamble identi- *621 fíed the fluid and blood accumulation and broken arm as secondary to a fall.
¶ 6. Following the discovery of the he-mothorax and broken arm, Gibson’s family transferred him to another nursing home. Gibson subsequently passed away on January 26, 2003. His death certificate lists sepsis as the cause of death, with contributing causes of fracture of the right humerus and hematoma in the lung.
¶ 7. At trial, the plaintiffs argued that AA negligently allowed Gibson to fall out of bed by failing to ensure his bed rails were kept upright. The plaintiffs argued this alleged negligence caused the hemo-thorax and broken arm, and that both injuries contributed to Gibson’s death. This theory was based on AA’s documentation of two previous falls and testimony by caregivers that the rails occasionally were left down. The plaintiffs also produced evidence that AA was negligent by: (1) allowing two bed sores to form by failing regularly to turn Gibson; (2) failure to prevent the bed sores from progressing and becoming infected by failure regularly to turn and use proper supplies; (3) failure to improve his malnourishment/dehydration and actually causing it to worsen by failing to ensure Gibson received the ordered PEG tube feedings; and (4) failing to provide range-of-motion exercises to prevent contractures. The plaintiffs also produced evidence that AA was short-staffed and that its employees who cared for Gibson failed properly to document his care and medical problems, all of which contributed to the above-noted injuries.
¶ 8. Conversely, the defendants argued that Gibson’s poor health preceded his admission to AA and that his injuries were a natural consequence of his poor health and could not be prevented. The defendants also argued that the plaintiffs had no documentation or eyewitness testimony to prove that a fall caused Gibson’s hemotho-rax and broken arm; thus, the plaintiffs’ case was based on pure speculation. The defendants’ experts opined that Gibson’s hemothorax was the product of congestive heart failure and that Dr. Gamble had nicked a vein or artery in drawing out the fluid (hence the blood-tinged fluid). The defendants also set forth the theory that the broken arm was an unexplained injury that likely happened on the way to or at the hospital. The defendants’ experts also testified that Gibson must have received the right amount of nutrition and liquid through his tube feedings, or the pressure sores would not have healed. And caregivers testified they regularly turned Gibson, always had adequate supplies and staff, and found no documentation of a fall that produced any injuries. Last, the defendants produced evidence that physical and occupational therapy failed to improve or prevent worsening of Gibson’s contrac-tures, so AA caregivers discontinued such therapy upon physician orders; however, the defendants maintained that AA did provide restorative care (range-of-motion exercises).
¶ 9. After hearing all the evidence, the jury rendered a verdict in favor of Gibson’s estate. The jury awarded the plaintiffs $1.5 million in compensatory damages, $75,000 of which it allocated for permanent disfigurement. So the trial court reduced the damages award to $575,000 due to the cap on noneconomic damages under Mississippi Code Section 11-1-60.[1]
¶ 10. The plaintiffs also moved to allow the jury to consider punitive damages.
*622 The plaintiffs did not introduce any additional evidence, but relied on the evidence presented during the compensatory damages phase.[2] The trial court denied the plaintiffs’ motion for the jury to consider punitive damages.[3] The court ruled that, based on the evidence, it could not find AA’s conduct was “sufficiently egregious or offensive” to warrant a finding of “gross negligence” or “reckless disregard” or to submit the question of punitive damages to the jury.
Issues on Cross-Appeal[4]
1. Whether the trial court erred in denying the defendants’ motions for directed verdict and judgment notwithstanding the verdict.
¶ 11. Motions for directed verdict and judgment notwithstanding the verdict challenge the legal sufficiency of the evidence.[5] This Court applies the same standard of review for both motions:
This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferenee[s] that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. ■ On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.[6]
A. Foundation’s motions for directed verdict and judgment notwithstanding the verdict
¶ 12. Foundation argues that no evidence exists that it had an ownership interest in the facility or that it provided medical care to Gibson. Foundation argues that no liability can be imposed for providing managerial, administrative, or financial services to AA. Foundation further argues that its duties were akin to that of an administrator or licensee, which under Mississippi law does not impose on it a duty of care to nursing-home residents.[7]
¶ 13. At trial, all parties stipulated into evidence two contracts between Foundation and Magnolia: (1) a “Management Agreement” dated January 1, 2000; and (2) a “Financial Services Agreement” dated January 1, 2002. AA’s applications for licensure, which list Foundation as the managing entity, also were stipulated into evidence. The two agreements and applications were the only evidence the plaintiffs relied upon for Foundation’s liability.
*623 ¶ 14. To justify liability, the plaintiffs point to various provisions in the management agreement specifying that Foundation was to act “solely as agent and acting on behalf of Magnolia.” Under the management contract, Foundation’s duties included hiring and supervising personnel for the operation of the facility, arranging for supplies for the facility, and ensuring that the operation of AA complied with federal, state, and local laws. Other than arguing a few provisions directed at fees, the plaintiffs point to no specific provision in the financial services agreement. However, they argue that Foundation actually provided more, or at least the same services, set forth in the management agreement during the time the financial services agreement was in place.
¶ 15. During their rebuttal, the defendants called Diane Kelly, AA’s administrator. She testified that Magnolia owned AA and that employees were hired at the facility level and were employed by Magnolia. Kelly stated that Foundation did not hire, supervise/manage, train, or fire employees. She stated that Foundation never provided hands-on care to any resident, and that she hired the Director of Nursing, who in turn hired all nurses for AA.
¶ 16. Cindie Pittman, Foundation’s corporate controller, also testified on behalf of the defendants. She testified that Foundation provided services primarily of a financial nature throughout 2001 and 2002. According to Pittman, Foundation processed accounts payable, helped develop AA’s budget, and processed reporting for state agencies, the IRS, auditors, and lenders. Pittman stated that Foundation also performed computer services, risk management services, and purchasing functions to ensure bulk pricing.
¶ 17. As previously noted, Foundation argues that, under the terms of the contracts, its contracted services were analogous to that of a nursing-home administrator and licensee.[8] In Howard v. Estate of Harper ex rel. Harper, this Court reviewed the statutory and regulatory definitions of “administrator”[9] and “licensee”[10] and declined to find a common-law or statutory duty of care owed to a nursing-home resident by a nursing-home administrator or licensee.[11] In that case, the plaintiffs alleged the administrator was “responsible for management and supervision of the nursing home” and was negligent “by failing to hire an adequate amount of nursing personnel, to supervise and train the personnel, as well as prepare and maintain *624 adequate reeords[.]’[12] The plaintiffs alleged the licensee “failed to provide a sufficient number of qualified personnel, including nurses and other staff to meet the needs of the Plaintiffs[.]”[13] The court declined to “expand the common law duty that a nursing home or its proprietor or owner [are] liable under general principles of tort law for negligent acts or omissions regarding the care of its residents.”[14] The Court’s refusal to extend the duty was based on the absence of easelaw and statutory law, and the premise that “such expansion would be duplicative of the duty already owed by the nursing home business owner or proprietor[.]” [15] The Court also refused to hold the licensee and administrator liable for medical malpractice, since they were not medical-care providers.[16]
¶ 18. We agree that Foundation’s contractual duties are similar to those imposed under Mississippi law for an administrator and licensee. We see no reason to extend individual liability to cover an entity that provided some of the same services at issue in Howard. And, like the administrator and licensee in Howard, Foundation provided no medical care and thus cannot be liable for medical malpractice. Furthermore, the management contract clearly lists Foundation as “solely [an] agent and acting on behalf of Magnolia.” And in Mississippi, an “agent for a disclosed principal is not liable for the torts of the principal.”[17] To be liable, the agent must commit “individual wrongdoing.” [18] In other words, the agent incurs no personal liability absent fraud or equivalent misconduct.[19]
¶ 19. The plaintiffs presented no evidence that Foundation had committed an individual wrong, much less fraud or equivalent misconduct. The plaintiffs relied solely upon the two contracts and applications for licensure that established Foundation’s role as an authorized agent for a corporate principal, which is insufficient to impose individual liability. Therefore, considering the evidence in the light most favorable to the plaintiffs, reasonable jurors could not arrive at a verdict against Foundation. The trial court erred in denying Foundation’s motion for JNOV. Because Foundation was only an agent of Magnolia, it bears no responsibility for any portion of the judgment[20] and should be dismissed with prejudice from the suit.[21]
B. Magnolia’s motions for directed verdict and judgment notwithstanding the verdict
¶ 20. In cases of medical negligence, a plaintiff must prove that:
*625 (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform, to that required standard; (3) the defendant’s breach of duty was a proximate cause of the plaintiff’s injury, and; (4) the plaintiff was injured as a result.[22]
Magnolia moved for a directed verdict and JNOV on the issues of breach and causation. It specifically argued that the plaintiffs had failed to prove that AA proximately caused the hemothorax and broken arm that allegedly contributed to Gibson’s death. Magnolia further argued that the plaintiffs had failed to establish a breach of the standard of care in relation to Gibson’s pressure sores, nutrition, and hydration. It also argued that the plaintiffs had failed to establish AA caused Gibson’s contrac-tures. And on appeal, Magnolia argues that the plaintiffs failed to prove Gibson suffered from permanent disfigurement or that AA caused permanent disfigurement. However, Magnolia did not argue the issue of permanent disfigurement before the trial court, and as such, failed to preserve it for appeal.[23]
1. Whether the plaintiffs submitted sufficient evidence that AA proximately caused the hemothorax and broken arm which caused or contributed to Gibson’s death.
¶21. Magnolia argues that the plaintiffs offered only speculation to support their theory that AA caused Gibson’s hemothorax and broken arm. Magnolia argues that no evidence exists to prove that Gibson fell out of bed because the staff failed to ensure the bedrails were kept upright. Magnolia further argues that the jury’s verdict was based on possibility and not probability that the hemo-thorax and broken arm contributed to Gibson’s death.
¶22. Generally, expert testimony is needed in a medical malpractice case to prove that a breach of the standard of care caused or contributed to the alleged injury.[24] However, a medical expert does not have to testify with “absolute certainty,” but testimony, taken as a whole, must establish “reasonable medical certainty” that the negligence caused the injuries at issue.[25] Additionally, negligence and causation may be established by circumstantial evidence, “but this rule is qualified to the extent that the circumstances shown must be such as to take the case out of the realm of conjecture and place it within the field of legitimate inference.” [26] “[V]erdiets must rest upon reasonable probabilities and not upon mere possibilities^]”[27] This Court has ruled that “only in rare and exceptional cases” should the court take such a case from the jury.[28]
¶ 23. In this case, the jury was presented with testimony that Gibson’s bedrails, which were supposed to be up at all times, *626 were left down on occasion. Jacqueline Rollins, a certified nursing assistant, testified that she occasionally saw Gibson’s bedrails down when she would check on him. And medical records documented two falls, one of which was due to a faulty bedrail. While no injury resulted from these falls, this evidence established that Gibson’s bedrails were not always upright to prevent a fall.
¶ 24. Dr. Robert Oliver, Gibson’s treating radiologist, testified[29] that a hemotho-rax is usually caused by trauma. And based on Gibson’s x-rays, the fracture was not common for a man Gibson’s age unless he took a “severe fall.” According to the plaintiffs’ expert, Dr. Leonard Williams, the hemothorax and broken arm were caused by the same “significant trauma,” either being dropped or a fall to the floor. He based his opinion on a medical record dated November 22, 2002, in which an AA nurse noted Gibson suffered from a swollen right hand and fingers. Dr. Williams stated that this finding was indicative of Gibson’s arm fracture. Dr. Williams testified his opinion was supported by the hospital records, as Gibson’s arm was not red or swelling when he was admitted, and there was no calcification present on the x-rays to indicate healing beyond six weeks.
¶ 25. As for the hemothorax, Dr. Williams explained that the fluid buildup could have been a consequence of a fall, congestive heart failure, cancer, or tuberculosis. However, Gibson’s treating physician tested the fluid and ruled out cancer and tuberculosis. And Dr. Williams ruled out congestive heart failure based on the treating radiologist’s findings and the fact that Gibson was severely dehydrated when admitted to the hospital. Dr. Williams stated that if Gibson had been in congestive heart failure, the fluid administered to Gibson for his dehydration would have caused heart failure and possibly death. Dr. Williams also stated that the quantity of fluid withdrawn from Gibson’s chest evinced buildup of a few weeks; he also stated the clotted blood in the fluid indicated old blood. He also questioned the accuracy of AA’s records, and testified the hospital had detailed and appropriate documentation. Therefore, Dr. Williams concluded there was no evidence of congestive heart failure, but that Gibson’s hemotho-rax and broken arm were the result of trauma, the timing of which he placed at the nursing home. He also testified that the hemothorax and broken arm were contributing causes of Gibson’s death.[30]
¶ 26. Conversely, through cross-examination, Magnolia submitted that no evidence existed in AA’s records of any fall occurring in November or December 2002. Magnolia also pointed out that no one at AA ever noted swelling where the break occurred, and that Gibson’s treating physician at AA examined him at 3 p.m. on November 22, 2002, and did not document any problem with Gibson’s right arm. Magnolia also established through cross-examination that Gibson was anemic and had a history of congestive heart failure, both of which can cause fluid buildup in the chest. Magnolia’s expert, Dr. John Payne, testified that, in his opinion, Gibson had suffered from congestive heart failure on December 31, 2002, and that the blood-tinged fluid Dr. Gamble extracted indicated he had nicked Gibson’s artery or vein. Dr. Payne also stated that nothing in Gibson’s medical records indicated he had a fracture when he left AA in December
*627 2002. Dr. Payne testified that if Gibson had suffered a fracture at AA, medical records would have shown swelling at the site, bone protrusion, and signs of pain. And in Dr. Payne’s opinion, Gibson died because of multiple medical problems that had caused his heart to stop, including a history of heart failure, hypertension, diabetes, staph infection, stroke, and seizures.
¶ 27. In reviewing all the evidence, we find the plaintiffs established a “ ‘reasonable medical certainty’” that AA’s negligence caused the injuries at issue.[31] The jury had the responsibility to evaluate the circumstantial evidence in this case and to resolve any conflicts in the evidence. In reviewing the evidence in the light most favorable to the plaintiffs, we find substantial evidence supports the plaintiffs’ theory that AA negligently caused Gibson’s hemo-thorax and broken arm, which in turn contributed to his death. Thus, we affirm the trial court’s denial of the JNOV motion.
2. Whether the plaintiffs presented sufficient evidence that Magnolia breached the standard of care regarding Gibson’s nutrition and hydration and that such breach caused Gibson’s poor nutritional status and dehydration.
3. Whether the plaintiffs presented sufficient evidence that Magnolia’s negligence caused pressure sores and worsening of contractures.
¶ 28. The plaintiffs admitted at trial that Gibson was malnourished at the time he entered the nursing home. However, the plaintiffs contended AA failed to ensure that Gibson received the correct amount of liquids and food through his PEG tube, causing further malnutrition and dehydration. The plaintiffs also contended that Gibson was.not turned regularly to prevent the formation of pressure sores, nor was he provided restorative care/range-of-motion exercises to prevent his contractures from worsening.
¶ 29. In support of their argument, plaintiffs presented the testimony of Jacqueline Rollins, a certified nursing assistant, who cared for Gibson during July through August 2001. She testified that, many times, AA was short-staffed, which prevented her from making rounds every two hours as required. She stated that the short staffing prevented Gibson from being regularly turned or kept clean.[32] Rollins stated that she never saw a turn clock[33] in Gibson’s room and that AA often was short of supplies, such as barrier cream.[34] She also testified that many times she found Gibson’s bed linens soaked in milk, with his PEG tube disconnected. Rollins believed Gibson’s roommate, who was mentally challenged, pulled out Gibson’s PEG tube, because she often found the roommate standing over Gibson with the tube disconnected.
¶ 30. Viola Bryant, another certified nursing assistant who provided care to Gibson in May or June 2001, also testified that AA was short-staffed “most of the time.” She also stated that the short-staffing prevented her from making all her rounds, that she found Gibson wet sometimes, and that the facility was short of supplies “sometimes.” Ray Gibson, one of *628 Gibson’s children, also testified that he had seen his father’s feeding tube out with liquid in the bed.
¶ 31. Cynthia Clevenger, a registered nurse and plaintiffs’ expert,[35] testified that a nurse is trained to notice weight-loss, abnormal labs, and make sure the PEG tube[36] is hooked up to the resident with the proper amount of food. Clevenger stated that Magnolia should have moved Gibson to another room to prevent the roommate from pulling out Gibson’s PEG tube. Clevenger testified that AA’s records regarding the tube feedings and fluid were unreliable, because they (1) documented Gibson refusing to eat when in fact he was on a feeding tube; and (2) documented that he received more liquids than ordered but still exhibited signs of dehydration. When asked whether it was the “normal course for someone to lose weight from a nursing standpoint when they’re on a PEG tube,” Clevenger responded “[n]o, not at all.”
¶ 32. Clevenger also provided testimony regarding Gibson’s pressure sores. She stated AA was to turn and reposition Gibson every two hours, but that AA’s records failed to document such turning. Cleven-ger stated that Gibson’s first pressure sore was not discovered until it reached a stage 2 and that the nurses should have noticed it sooner before it had progressed. She also stated that the second pressure sore reached a stage 3 or 4 and became infected.
¶ 33. Dr. Williams testified that Gibson suffered from malnutrition and dehydration throughout his stay at AA. He testified that Gibson’s weight loss was a sign of his malnutrition and that hospital records documented Gibson’s dehydration. Dr. Williams stated that Gibson’s second pressure sore became infected due to Gibson’s malnourishment and AA’s failure to monitor the wound and turn Gibson. Dr. Williams stated that AA breached the standard of care and caused Gibson’s cont-ractures to worsen because it failed to provide restorative therapy and splints.
¶34. Conversely, Magnolia’s experts opined that AA met the standard of care in providing nutrition and liquids. Its experts, Nurse Practitioner Rene Slevenski and Dr. Payne, testified that Gibson was overweight when he entered AA; thus, the tube feedings met his caloric needs but did not exceed them, causing weight loss and not malnutrition. Slevenski also stated that Gibson’s albumin levels — a protein that measures nutritional status — increased over his stay at AA. Slevenski and Dr. Payne testified that Gibson’s underlying medical conditions placed him at high risk for developing bed sores, but once they developed, AA properly monitored them and got expert help from a wound-care center. Slevenski and Dr. Payne also testified that Gibson’s pressure sores healed, indicating he had sufficient water and protein and that AA was turning him. Slevenski stated that dehydration is assessed by looking at sodium levels, and that Gibson’s levels did not increase until after he left AA. Dr. Payne also stated that any dehydration in December 2002 was likely the result of a GI bleed, which AA had no control over. However, Dr. Payne admitted on cross examination that Gibson did not get enough calories and fluids at times while a resident at AA. He admitted that Gibson was dehydrated from *629 lack of fluids in May 2002 and again in December 2002, and that the December 2002 dehydration was a contributing cause of Gibson’s renal failure.
¶ 35. Magnolia also presented the testimony of two licensed practical nurses who provided care to Gibson. Both of these nurses testified that they used a clock to turn Gibson every two hours. Nurse Pink-ye Myles testified that it was not normal practice to document each time a nurse turned a patient but to document they completed all required care. Myles also stated that AA was always properly staffed, and Nurse Betty Munson stated they had enough supplies to care for patients. Both nurses admitted they had witnessed Gibson pulling out his PEG tube.
¶ 36. Based on the above testimony and evidence, we find the plaintiffs provided substantial evidence to support the jury’s verdict. The plaintiffs provided fact and expert witnesses whose testimony supports a jury finding that AA breached various standards of care that in turn caused Gibson’s injuries. The jury chose to believe the plaintiffs’ witnesses rather than Magnolia’s witnesses. Thus, we affirm the trial court’s denial of the JNOV motion.
II. Whether the trial court abused its discretion in denying Magnolia’s motions for mistrial.
¶ 37. This Court reviews a grant or denial of a motion for mistrial for an abuse of discretion.[37] This Court has ruled that the trial judge is in the “best position for determining the prejudicial effect of an objectionable remark.”[38] And absent “serious and irreparable damage ... the judge should admonish the jury then and there to disregard the impropriety."[39]
A. Testimony relevant to the punitive-damages phase
¶ 38. Punitive damages are appropriate only in cases where the plaintiff shows by clear and convincing evidence that the defendant acted with malice, gross negligence evidencing willful, wanton, or reckless disregard for the safety of others, or the commission of actual fraud.[40] Punitive damages are awarded in the most egregious cases.[41] But the jury hears evidence related to punitive damages only after it has awarded compensatory damages.[42] Thus, the punitive-damages phase is bifurcated from the compensatory phase.[43]
¶39. Magnolia asserts that plaintiffs’ counsel improperly solicited evidence applicable only at the punitive-damages phase during the compensatory phase, and thus the trial court abused its discretion in failing to grant a mistrial. Plaintiffs’ counsel asked Clevenger whether she had “an opinion as to whether the standards of care were grossly deviated from in this case?” Before Clevenger respond *630 ed, Magnolia objected, and the trial court sustained the objection. Thereafter, plaintiffs’ counsel asked Clevenger to characterize Gibson’s care and treatment. Clevenger responded that the care was “egregious and outrageous and showed blatant disregard for [Gibson’s] health and well-being.” After Clevenger’s response, Magnolia objected and moved for a mistrial. The trial court denied the motion but ordered the jury to disregard Clevenger’s response.
¶ 40. We first note that the jury did not hear any improper testimony after counsel’s first question, as Magnolia timely objected. However, Magnolia failed to timely object during Clevenger’s response to the second question, and thus waived its objection to that testimony.[44] Notwithstanding Magnolia’s waiver, we find no merit in its argument.
¶ 41. When a plaintiff improperly introduces evidence probative of punitive damages, this Court finds reversible error when that evidence materially prejudices the defendant.[45] In Mariner Healthcare, Inc. v. Estate of Edwards, this Court found reversible error with testimony admitted throughout trial that portrayed a nursing home as “focused on financial success rather than competent care.”[46] This Court found no evidence that the testimony was relevant to the issues of duty, breach, causation, or injury, but that it was introduced to “emphasize the ‘bad character’ ” of the company, and thus materially prejudiced the defendant.[47]
¶ 42. Unlike the testimony at issue in Mariner Health Care, Inc., Clevenger’s testimony was an isolated incident of evidence relevant to punitive damages. While Clevenger testified improperly by using “buzz words” associated with punitive damages, we cannot conclude that it materially prejudiced Magnolia. The trial judge immediately instructed the jury to disregard the testimony, and the jury is presumed to have done so.[48] The trial court did not abuse its discretion in denying the Defendants’ motion for mistrial based on Clevenger’s testimony.
B. Alleged improper statements by plaintiffs’ counsel
¶ 43. Magnolia also argues that plaintiffs’ counsel made improper comments during his cross-examination of Dr. Payne. Magnolia specifically points to the plaintiffs questioning Dr. Payne about the deposition of Gibson’s treating radiologist:
Q: Does [the radiologist] say that this man was in congestive heart failure?
A. The radiologist said pleural effusions.
Q. Not my question, sir. Does [the radiologist] ever once say that this man had congestive heart failure?
A. I think from what I read in the deposition, he mentioned congestive heart failure in that deposition as a potential cause of fluid. He did mention congestive heart failure in that deposition.
[Plaintiffs’ Counsel]: Your Honor, I move now to have this deposition moved *631 in as evidence so the jury can see that that is not the case.
A. I saw that he mentioned congestive heart failure.
[Defendants’ Counsel]: Your Honor, object, again, to the statements made in open court in this manner without questions to the witness .... these comments are completely inappropriate.... The Court: Testimony comes from the witness stand.
[Plaintiffs’ Counsel]: Yes, ma’am.
The Court: Counsel will ask the questions. Counsel will not comment on the evidence being at this point the response by the witness. If counsel needs to add a followup question A, B, C, D, E, F, that will be allowed, but counsel is prohibited from commenting on the evidence.
Q. Doctor, do you believe — because the jury will have the testimony, is it your belief right now that he ever testified that when Mr. Gibson was admitted to the hospital that he had congestive heart failure?
A. What I saw in Dr. Gamble’s deposition is that he stated that the patient had bilateral effusions. He also mentioned the diagnosis of hemothorax, but I also recall reading in Dr. Oliver’s deposition that he did mention somewhere in that deposition congestive heart failure. That’s what I recall reading in his deposition.
[Plaintiffs’ Counsel]: And the jury will have their notes on that.
After the plaintiffs’ last comment, Magnolia again objected and moved for mistrial. The trial court denied the motion, instruet-ing plaintiffs’ counsel not to comment but ask questions.
¶ 44. In reviewing the complete cross-examination of Dr. Payne, we do not find the trial court abused its discretion in denying the motion for mistrial. While plaintiffs’ counsel improperly commented on Dr. Payne’s testimony, the transcript reveals counsel’s frustration at Dr. Payne’s failure to answer questions on cross-examination. And as acknowledged by the trial court, plaintiffs’ counsel could have established the. same point through proper questioning instead of commenting. Furthermore, the trial court sustained Magnolia’s objections and admonished plaintiffs’ counsel in front of the jury. Thus, we find no material prejudice and no basis for a mistrial. The trial court did not abuse its discretion in denying Magnolia’s second motion for a mistrial.
Issues on Direct Appeal
I. Whether the trial court abused its discretion in declining to submit the issue of punitive damages to the jury for its consideration.
¶ 45. If the jury awards compensatory damages, the trial court conducts an evidentiary hearing on the issue of punitive damages in the presence of the jury.[49] As previously noted, punitive damages are appropriate only in cases where the plaintiff shows by clear and convincing evidence that the defendant acted with malice, gross negligence evidencing willful, wanton, or reckless disregard for the safety of others, or the commission of actual fraud.[50] Punitive damages are warranted in the most egregious cases[51] upon an examination of the “totality of the circumstances and the aggregate conduct of the *632 defendant.”[52] But “[i]f the judge, from the record, should determine, as a matter of law, that the jury should not be allowed to consider the issue of punitive damages, a directed verdict shall be entered in favor of the defendant on the issue of punitive damages, and the case will end.”[53] This Court applies an abuse-of-discretion standard to the determination of whether a case warrants the consideration of punitive damages.[54]
¶ 46. The plaintiffs did not present any additional evidence at the punitive-damages phase but relied on the evidence submitted during the compensatory phase. In reviewing the totality of the record before the trial court, we find no abuse of discretion. We have addressed the allegations and conduct at issue throughout this opinion, and find the trial court correctly ruled the plaintiffs did not show by clear and convincing evidence that Magnolia acted with willful, wanton, or reckless disregard for the safety of others, or committed actual fraud.[55]
II. Whether the statutory cap on non-economic damages set forth in Mississippi Code Section 11-1-60(2)[56] is unconstitutional.
¶47. Plaintiffs’ argument regarding the constitutionality of the noneco-nomic-damages cap is raised for the first time on appeal. It is a well-settled rule that the “constitutionality of a statute will not be considered unless the point is specifically pleaded.”[57] “[Tjhis Court has also consistently held that errors raised for the first time on appeal will not be considered, especially where constitutional questions are concerned.”[58] This Court will depart from that rule only in “unusual circumstances,” which are not present in this case.[59] Thus, this issue is procedurally barred on appeal.
Conclusion
¶ 48. Some of Foundation’s contractual duties were similar to these of a licensee and administrator, neither of which owe any duty to nursing-home residents. Furthermore, the plaintiffs presented no evidence of individual liability. Therefore, we order the trial court to dismiss Foundation with prejudice and remove its name from the final judgment. We affirm the trial court’s denial of Magnolia’s motions for directed verdict and judgment notwithstanding the verdict. The parties presented the jury with competing theories of breach and causation, and substantial evidence exists to support the verdict against Magnolia. We also find the trial court did not abuse its discretion in denying Magnolia’s motions for mistrial, as none of the improper testimony or comments prejudiced Magnolia. We affirm trial court’s finding that this case is not egregious and thus does not warrant the consideration of punitive damages. Lastly, we find the constitutionality of the noneconomic-dam- *633 ages cap is procedurally barred from appellate review.
¶ 49. In summary, we reverse that part of the trial court’s order denying Foundation’s motions for directed verdict and judgment notwithstanding the verdict, and we remand for the court to dismiss with prejudice and strike Foundation’s name from the final judgment. We affirm as to all other issues.
¶ 50. ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, KITCHENS, PIERCE AND KING, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.

. At the time the complaint was filed on August 25, 2004, Section 11-1-60 provided that "[t]he term 'noneconomic damages' shall not include damages for disfigurement[.]” H.B. 2, Miss. Laws 3rd Ex. Sess. Ch. 2 § 7 (2002) (emphasis added). In 2004, the definition of noneconomic damages was amended to include disfigurement. H.B. 13, Miss. Laws 1st Ex. Sess. Ch. 1 § 2 (2004). That amendment applied to causes of action filed on or after *622 September 2, 2004. Id. at § 20; see Miss. Code Ann. § 11-1-60 (Supp.2011).

. The plaintiffs moved to admit into evidence a state survey in which AA was cited for failing to provide sufficient fluid intake. The trial court did not rule on the survey’s admissibility but took it under advisement pending its ruling on whether the jury should consider punitive damages.

. The hearing on punitive damages was not conducted in front of the jury. This Court has ruled that, under Mississippi Code Section 11-1-65, an evidentiary hearing on punitive damages is held in the presence of the jury if the jury has awarded compensatory damages. Bradfield v. Schwartz, 936 So.2d 931, 938-39 (Miss.2006). However, the defendants do not raise any issue regarding the procedure followed in this case.

. For ease of discussion, we discuss the issues on cross-appeal first. We also address additional facts as necessary under each issue.

. Solanki v. Ervin, 21 So.3d 552, 565 (Miss. 2009).

. Blake v. Clein, 903 So.2d 710, 731 (Miss. 2005).

. Mariner Health Care, Inc. v. Estate of Edwards, 964 So.2d 1138, 1156-57 (Miss.2007).

. Foundation makes this argument in the alternative. Foundation first points to the the testimony of Kelly and Pittman and argues it never performed many of the services outlined in the managerial contract that the plaintiffs contend are the bases of Foundation’s negligence. In applying the standard of review, we will assume Foundation did in fact perform the duties outlined in the managerial contract.

. The term "nursing-home administrator” or "administrator” means any individual who is charged with the general administration of a nursing home, whether or not such individual has an ownership interest in such home and whether or not the functions and duties are shared with one or more individuals. "General administration of a nursing home” means the duties of administrative performance and the making of day-to-day decisions involved in the planning, organizing, directing and/or controlling of a nursing home. Miss.Code Ann. § 73-17-5 (Rev. 2008).

. A licensee is one "upon whom rests the responsibility for the operation of the institution in compliance with these rules, regulations, and minimum standards.” Miss. Dep’t of Health, Rules, Regulations and Minimum Standards for Institutions for the Aged or Infirm, Ch. 45, Reg. 101.16 (Aug. 13, 2011).

. Howard v. Estate of Harper, 947 So.2d 854 (Miss.2006).

. Id. at 856.

. Id. at 857.

. Id. at 858.

. Id.

. Id. at 860.

. Jeffrey Jackson & Mary Miller, 1 Encyclopedia of Mississippi Law § 4:16 (2001) (citing Turner v. Wilson, 620 So.2d 545 (Miss. 1993)).

. Turner, 620 So.2d at 548.

. Gray v. Edgewater Landing, Inc., 541 So.2d 1044, 1047 (Miss. 1989).

. See Miss.Code Ann. § 85-5-7 (Rev. 2011) ("In assessing percentages of fault ... a principal and the principal's agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or omission of the employee or agent.”).

. Mariner Health Care, Inc., 964 So.2d at 1157 (court ordered that nursing-home administrator and licensee be dismissed with prejudice on remand because they were not proper parties to nursing-home negligence case).

. McDonald v. Mem’l Hosp. at Gulfport, 8 So.3d 175, 180 (Miss.2009) (emphasis added).

. Mabus v. Mabus, 890 So.2d 806, 811 (Miss. 2003).

. McDonald, 8 So.3d 175.

. Blake v. Clein, 903 So.2d 710, 731-32 (Miss.2005) (quoting Stratton v. Webb, 513 So.2d 587, 590 (Miss. 1987)).

. Tombigbee Electric Power Ass’n v. Gandy, 216 Miss. 444, 454, 62 So.2d 567 (1953).

. Id. at 455, 62 So.2d 567.

. Mississippi Valley Gas Co. v. Estate of Walker, 725 So.2d 139, 145-46 (Miss. 1998) (quoting BFGoodrich Inc. v. Taylor, 509 So.2d 895, 904 (Miss. 1987), overruled on other grounds by Adams v. U.S. Homecrafters, Inc., 744 So.2d 736 (Miss. 1999)).

. Dr. Oliver’s deposition was marked for identification and read at trial.

. Dr. Williams also stated that AA caused Gibson to suffer dehydration, which, in his opinion, led to kidney failure and contributed to Gibson’s death.

. Blake v. Clein, 903 So.2d 710, 731-32 (Miss.2005) (quoting Stratton v. Webb, 513 So.2d 587, 590 (Miss.1987)).

. Testimony established that cleanliness prevents skin breakdown and helps pressure sores.

. A turn clock is a device that allowed the staff to keep track of when to turn/reposition a patient.

. Barrier cream is an ointment applied to a patient’s skin to reduce friction and prevent pressure sores.

. Nurse Clevenger was accepted without objection as an “expert in the field of long-term care, nursing standards of care and long-term care, and the federal regulations as well as survey policies.” We note that the defendants assert error on appeal regarding Clevenger's testimony relevant to punitive damages (see infra ¶¶ 38-42) but make no further objection regarding the remainder of her testimony.

. The PEG tube is inserted directly into the patient's stomach.

. United Servs. Auto. Ass’n (“USSA”) v. Lisanby, 47 So.3d 1172 (Miss.2010).

. Id. at 1184 (quoting Coho Res., Inc. v. McCarthy, 829 So.2d 1, 18 (Miss.2002)).

. Id. (quoting Coho Res., Inc., 829 So.2d at 18).

. Hartford Underwriters Ins. Co. v. Williams, 936 So.2d 888, 896 (Miss.2006).

. Id.

. Id. at 897.

. See Mariner Health Care, Inc. v. Estate of Edwards, 964 So.2d 1138, 1148-49 (Miss. 2007).

. Hyundai Motor America v. Applewhite, 53 So.3d 749, 755 (Miss.2011) (failure to make contemporaneous objection waives issue on appeal).

. Mariner Health Care, Inc., 964 So.2d at 1149.

. Id. at 1149.

. Id.

. See United Servs. Auto. Ass'n v. Lisanby, 47 So.3d 1172, 1184 (Miss.2010) (noting that this Court will presume the jury follows trial judge's instruction to disregard improper testimony).

. Bradfleld v. Schwartz, 936 So.2d 931, 939 (Miss.2006).

. Hartford Underwriters Ins. Co. v. Williams, 936 So.2d 888, 896 (Miss.2006).

. Id.

. Bradfield, 936 So.2d at 937.

. Id. at 939.

. Mariner Health Care, Inc. v. Estate of Edwards, 964 So.2d 1138, 1148 (Miss.2007).

. Hartford Undeiwriters Ins. Co. v. Williams, 936 So.2d 888, 896 (Miss.2006).

. Section ll-l-60(2)(a) caps noneconomic damages awards at $500,000 in cases based on "malpractice or breach of standard of care against a provider of health care, including institutions for the aged or infirm." Miss. Code Ann. § 1 l-l~60(2)(a) (Supp.2011).

. Smith v. Fluor Corp., 514 So.2d 1227, 1232 (Miss. 1987).

. Stockstill v. State, 854 So.2d 1017, 1023 (Miss.2003) (citations omitted).

. Cockrell v. Pearl River Valley Water Supply Dis., 865 So.2d 357, 360 (Miss.2004).