# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-00293-SCT

*B. MICHAEL WEBER, M.D., AND THE OB-GYN
GROUP OF LAUREL, P.A.*

*v.*

*ESTATE OF CAMERON CHASE HILL,
DECEASED, BY AND THROUGH JANA C.
BRACEWELL, ADMINISTRATRIX*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/24/2019 |
| TRIAL JUDGE: | HON. MICHAEL H. WARD |
| TRIAL COURT ATTORNEYS: | F. M. TURNER, III |
| | BENJAMIN BLUE MORGAN |
| | PEELER GRAYSON LACEY, JR. |
| | ROMNEY HASTINGS ENTREKIN |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROMNEY HASTINGS ENTREKIN |
| | PEELER GRAYSON LACEY, JR. |
| ATTORNEY FOR APPELLEE: | F. M. TURNER, III |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND REMANDED - 12/16/2021 |
| MOTION FOR REHEARING FILED: | 01/13/2022; DENIED AND OPINION MODIFIED AT ¶ 37 AND ¶ 38 - 04/07/2022 |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     A Jones County jury returned a $4 million verdict in favor of Plaintiff, Jana C.

Bracewell, Administratix of the Estate of Cameron Chase Hill, in a medical negligence/

wrongful-death suit against Defendants, B. Michael Weber, M.D., and The OB-GYN Group

of Laurel, P.A. The Jones County Circuit Court reduced the jury's noneconomic-damages award from $2,538,322 to $500,000 pursuant to Mississippi Code Section 11-1-60(2)(a). Defendants appeal from the judgment claiming the trial court erred by denying their posttrial motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. Plaintiff cross-appeals, claiming the trial court erred by reducing the jury's noneconomic-damages award.

¶2. We find no error in the trial court's decision to deny Defendants' motion for a JNOV or a new trial.

¶3. As to Plaintiff's cross-appeal, we agree that the trial court erred by reducing the jury's noneconomic-damages award, given that this action was filed before September 1, 2004, the date the amended version of Section 11-1-60(2)(a) went into effect.

**FACTS AND PROCEDURAL HISTORY**

¶4. In April 2001, Erica Shae Hill learned she was pregnant. Dr. Weber's partner, Dr. Robert DeSantis, was Hill's primary OB-GYN throughout her pregnancy.

¶5. On November 19, 2001, a nonstress test was performed on Shae, which showed a pattern of healthy fetal activity. On November 23, 2001, Hill went into labor around 2:30 a.m. Once the contractions were about five minutes apart, she decided to go to South Central Regional Medical Center (SCRMC) in Laurel, Mississippi. Hill arrived at SCRMC's emergency room at approximately 3:30 a.m and was admitted to the labor-and-delivery floor around 5:00 a.m. Dr. Weber, who was on call for Dr. DeSantis that night, managed Hill's

2

care throughout labor, and he delivered Cameron Chase Hill by vaginal delivery at approximately 1:10 p.m. that afternoon.

¶6. Cameron and Hill were discharged on November 25, 2001. The next day, Cameron was taken to Forrest General Hospital because he was not eating. Physicians at Forrest General Hospital performed a lumbar puncture, which proved to be abnormal with the cerebral spinal fluid containing an elevated white blood cell count of thirty-two (six times the normal limit) and an elevated protein level of 236 (five to six times the normal limit). Cameron's Glucose level was also in the low, normal range. A CT head scan was performed on November 27, 2001, and an MRI head scan was performed on December 14, 2001.

¶7. Cameron ultimately was diagnosed with hypoxic ischemic encephalopathy (HIE), which is a neurological injury resulting from lack of oxygen to the brain. According to Defendants, Cameron's Forrest General Hospital records for his admission shortly after birth include a secondary diagnosis of "viral meningits – NOS."

¶8. Cameron lived only to the age of five. He died on March 23, 2007. There is no dispute that he had significant neurological deficits that required continual and significant treatment over the course of his short life.

¶9. Plaintiff filed a complaint in December 2002 on behalf of Cameron, alleging negligence on the part of Dr. Weber and The OB-GYN Group of Laurel. The complaint claimed that Dr. Weber breached the applicable standard of care by failing to recognize, appreciate, and respond to the signs and symptoms of fetal distress, ischemia, and/or hypoxia during the labor and delivery of Cameron.

¶10.    Following Cameron's death in 2007, Bracewell was substituted in 2010 as the administratrix of Cameron's estate.  Plaintiff filed her designation of expert witnesses in December 2013, and Defendants designated their expert witnesses in February 2014.

¶11.    In September 2015, Plaintiff filed a motion to recuse then-presiding Judge Dal Williamson, which was granted on the same day.  In October 2015, this Court appointed Special Judge Michael Ward to preside over the matter.

¶12.    Following a series of continuances, trial began on October 14, 2019.  After Plaintiff's case-in-chief, Defendants moved for a directed verdict on basis that Plaintiff's evidence "failed to close the critical and substantive evidentiary gap regarding the causation element of her medical negligence claim."  The trial court denied the motion and proceeded with Defendants' case-in-chief.  Afterwards, Defendants renewed the motion for directed verdict.  The trial court denied the motion, saying that, "While I do think it's a little thin, I'm going to let it go to the jury."

¶13.    The jury returned a verdict in favor of the Plaintiff, awarding damages as follows: $1.2 million for Cameron's lost wages; $261,677.52 for Cameron's past medical expenses; and $2,538,322.48 for Cameron's noneconomic damages.  The trial court reduced the noneconomic jury award to $500,000, which left a total verdict of $1,961,677.52.

¶14.    Both parties filed posttrial motions.  Plaintiff requested that the trial court alter or amend the judgment to eliminate the reduction of the jury's verdict for noneconomic damages. Defendants requested a JNOV or, in the alternative, a new trial. They claimed that Plaintiff had failed to prove the causation element of her medical-negligence claim; thus,

4

they were entitled to judgment in their favor as a matter of law. Alternatively, they claimed that the jury's verdict was inconsistent with the overwhelming weight of unrebutted, objective medical evidence and was clearly based on bias, passion, and prejudice. The trial court denied both motions. These appeals followed.

## DISCUSSION

I. **Whether Defendants were entitled to a JNOV because Plaintiff failed to offer any admissible expert testimony at trial that the HIE, more likely than not, developed within the relevant six-hour window between 7:00 a.m. and delivery at 1:10 p.m.**

¶15. Defendants argue that Plaintiff's theory of liability is that Dr. Weber breached the applicable standard of care by allowing labor to continue beyond 7:00 a.m. rather than performing a C-section delivery at the time.[1] They contend that this required the Plaintiff to prove by expert testimony that a C-section delivery at approximately 7:00 a.m. would have provided Cameron with a greater-than-50-percent chance of a substantially better outcome than was obtained. Defendants contend that a critical evidentiary gap has existed since before the summary-judgment stage, which was not cured at trial. They maintain that Plaintiff's proof lacked expert testimony to satisfy the causation element of her medical-negligence claim. And they maintain that Plaintiff could not prove that an earlier C-section would have provided a greater-than-50-percent chance of a substantially better outcome without first proving the probability that the HIE developed during the six-hour window between 7:00 a.m. and 1:10 p.m. They submit that none of the seven physicians who testified

_____

[1] Defendants maintain that Dr. Weber exceeded the minimum standard of care; they concede that a fact issue existed on the standard-of-care element. But they contend further that a genuine issue of material fact existed as to the critical issue of causation.

5

at trial, including Plaintiff's two experts, were able to reliably conclude that Cameron's HIE developed during the relevant six-hour window.

¶16.  In a medical-malpractice action, the plaintiff must provide evidence that proper treatment or care "would have provided the patient 'with a greater than fifty (50) percent chance of a [substantially] better result than was in fact obtained.'" *Harris v. Shields*, 568 So. 2d 269, 274 (Miss. 1990) (alteration in original) (quoting *Ladner v. Campbell*, 515 So. 2d 882, 889 (Miss. 1987)).  Thus, "[a]dequate proof of proximate cause . . . requires evidence that in the absence of the alleged malpractice, a [significantly] better result was probable or more likely than not."  *Id.* (third alteration in original) (internal quotations marks omitted) (quoting *Ladner*, 515 So. 2d at 888).

¶17.  "[N]egligence and causation may be established by circumstantial evidence, 'but this rule is qualified to the extent that the circumstances shown must be such as to take the case out of the realm of conjecture and place it within the field of legitimate inference.'" *Est. of Gibson ex rel. Gibson v. Magnolia Healthcare, Inc.*, 91 So. 3d 616, 625 (Miss. 2012) (quoting *Tombigbee Elec. Power Ass'n v. Gandy*, 216 Miss. 444, 454, 62 So. 2d 567 (1953)).  "'[O]nly in rare and exceptional cases' should the court take such a case from the jury."  *Id.* (quoting *Miss. Valley Gas Co. v. Est. of Walker*, 725 So. 2d 139, 145-46 (Miss. 1998), *overruled on other grounds by Adams v. U.S. Homecrafters, Inc.,* 744 So. 2d 736 (Miss. 1999)).

¶18.  Shortly after Shae arrived at the hospital at approximately 3:00 a.m. on November 23, an external monitor was applied to Shae to measure her contractions and record the baby's

6

heart rate. According to Dr. Frederick Gonzalez, who testified on behalf of Plaintiff as an expert in obstetrics and maternal-fetal medicine, the baby showed signs of "trouble from the beginning." The fetal heart-monitor tracings were abnormal, indicating what Dr. Gonzalez described as late decelerations.

¶19. He explained that there are three types of fetal heart-rate decelerations: early decelerations, which indicate head compression and generally are not harmful to the baby; variable decelerations, which occur when the baby's umbilical cord is compressed; and late decelerations, which are a sign of uteroplacental insufficiency. Uteroplacental insufficiency means a decrease in the amount of oxygen (hypoxia) and blood flow (ischemia) going to the baby, which can lead to encephalopathy (brain damage).

¶20. According to Dr. Gonzalez, the nurses attending to Shae appropriately started resuscitative measures, such as administering intravenous fluids to Shae, providing oxygen, and changing her position to try to improve her baby's heart rate. Dr. Gonzalez said the situation improved briefly, but the late decelerations resumed, along with a decrease in beat-to-beat variability.

¶21. Nursing staff informed Dr. Weber of the situation, and Shae was admitted to labor and delivery at approximately 5:00 a.m. per Dr. Weber's order. Dr. Weber first saw Shae around 7:50 a.m. He saw that the baby was having abnormal heart-rate decelerations and diminished variability in the beat-to-beat heart rate. Dr. Weber wrote in his notes at 8:00 a.m. that he anticipated a vaginal delivery. Dr. Weber testified that, based on his notations, his interpretation of the fetal heart tracings was that the decelerations were not late decelerations

7

but rather variable decelerations given their inconsistency and nonrepetition. He said variable decelerations are the most common form of decelerations, comprising about 70 percent of the decelerations that occur during labor.

¶22. Dr. Gonzalez testified, however, that there were both late decelerations and variable decelerations. The fetal heart monitor showed nonreassuring tracing that Dr. Weber should have been aware of, according to Dr. Gonzalez. He said that under the proper standard of care, rather than allow labor to continue, Dr. Weber should have done a C-section delivery when he came at 7:00 a.m. and looked at the tracing. Dr. Gonzalez said that, as hours go by, the situation gets worse. "So now you have intrauterine growth restriction, uteroplacental insufficiency, and cord compression cutting off blood flow[,] . . . [and] you're adding insults to this baby." Dr. Gonzalez said that, in his opinion, to a reasonable medical probability, Cameron's HIE injury was caused by uteroplacental insufficiency and cord compression during the labor process. He testified that had Dr. Weber performed a C-section at or around 7:00 a.m., the baby "would have been fine."

¶23. Dr. Michael Lipton testified for Plaintiff as an expert in neuroradiology. He testified as to the nature of the brain injury seen on the CT scan conducted on November 27, 2001, as well as the MRI exam conducted on December 14, 2001. He testified that, in reviewing the MRI exam in correlation with the CT scan, he could confirm the likelihood of the ischemic event occurring a few days before the November 27 CT scan.

¶24. Dr. Lipton testified that Cameron's brain injury was not meningitis as submitted by Defendants' expert, Dr. Elias Chalhub. Dr. Lipton explained that "Meningitis is an infection

8

of the meninges, of the coverings of the brain. While it certainly can be associated with the appearance of brain swelling, it's typically, it's not going to be associated with such extensive tissue injury as we see here." Dr. Lipton said that the injury was directly to the brain tissue itself, not to the meninges coverings "that are on the outside of the brain."

¶25. We find that Dr. Lipton's testimony coupled with Dr. Gonzalez's testimony constitutes sufficient evidence on the issue of causation. Dr. Lipton provided testimony that Cameron's HIE injury most likely occurred a few days before the November 27 CT scan, which was around the time of Cameron's delivery. Dr. Gonzalez provided testimony that Cameron's HIE injury was caused by uteroplacental insufficiency and cord compression during the labor process. From this evidence, we find that a juror could reasonably conclude that a timely C-section delivery would have provided Cameron with a greater-than-50-percent chance of a substantially better outcome.

II. **Whether the trial court abused its discretion and committed reversible error by allowing Dr. Gonzalez to offer causation opinion testimony as to the timing and cause in fact of the HIE at trial over Defendants' objections.**

¶26. Defendants contend that because none of the other six physicians who testified at trial were able to or willing to support Plaintiff's causation theory that the HIE would have been avoided had a C-section been performed at approximately 7:00 a.m., Plaintiff had to rely on Dr. Gonzalez to fill the essential causation gap at trial. But Dr. Gonzalez testified during his deposition and again at trial that, as an OB-GYN, he does not consider himself to have the appropriate expertise to offer qualified opinion testimony regarding the timing and cause in fact of HIE. Consequently, Dr. Gonzalez was forced to rely on the testimony of Plaintiff's

9

neuroradiology expert, Dr. Lipton, to determine when the HIE developed. But because Dr. Lipton's opinions were inconclusive, they provided no reliable support for Dr. Gonzalez's conclusory assumptions.

¶27. We disagree. As Plaintiff points out, Dr. Gonzalez based his opinions on the prenatal records of The OB-GYN Group of Laurel; prenatal testing and labor-and-delivery records of South Central Regional Medical Center regarding Cameron; the medical records of Forrest General from November 26 to December 17, 2001, when the HIE injury was diagnosed; and the testimony of Dr. Lipton.

¶28. Dr. Gonzalez was qualified as an expert in the fields of obstetrics and maternal-fetal medicine. During the course of his medical practice since 1976, Dr. Gonzalez has been responsible for the prenatal care, labor management, and delivery of thousands of babies. As a maternal-fetal subspecialist, his practice has dealt with high-risk pregnancies, in which the risk is substantial.

¶29. Dr. Gonzalez's testimony makes clear that he was qualified to testify about events occurring during labor and delivery and the relationship of those events to conditions later diagnosed.

> Q. And, Dr. Gonzalez, at your deposition we agreed that when it comes to ruling in and ruling out potential causes of hypoxic-ischemic encephalopathy, that the ruling in and ruling out process is done by physicians trained and credentialed to take care of children such as pediatricians, neonatologists, and pediatric neurologists, isn't that correct?
>
> A. Well, that's one piece of the puzzle. I mean, I'm the obstetrician. I'm the one who decides whether or not there is non-reassuring tracing, if there's risk for hypoxic-ischemic encephalopathy. And then I look at the evidence

10

after the baby is born, but ultimately it is up to the pediatricians to make that final diagnosis, not me.

Q.      Okay. So that ruling in, ruling out process is done by the pediatric physicians?

A.      Well, again, as I stated, it is up to me to decide the obstetrical components. They have no more knowledge [sic] they have about as much knowledge of the obstetrical components as I have of the pediatric component. I mean, there's some cross-pollination, but they are the ones that are trained in taking care of the baby. I'm trained in taking care of the baby when it's inside the mother.

Q.      So they give information that you're not privy to and consider it, whether it's imaging, lab results, things that they have to use to rule in and rule out possible causes of hypoxic-ischemic encephalopathy. That's done by the pediatricians, the neonatologist, and the pediatric neurologist? That's the question, Dr. Gonzalez.

A.      Well, the only issue I have is "privy to." I mean, we think quality assurance and - - whenever we have bad outcomes. So I have all of that information. And we would sit down, and we would discuss what were the obstetrical risk factors, what is it that happened to the baby, and then we would reach a consensus as to what the diagnosis was. But again, they have to take into consideration what happened obstetrically. It's not like all of a sudden the kid is born and that's where all the information is. You know, they all take into consideration what happened before the birth.

¶30.    Dr. Gonzalez testified from his own knowledge, training, and experience about the factors giving rise to hypoxia during labor and how hypoxia affects the baby. In addition, he relied on the diagnosis of HIE injury reached by the treating physicians and confirmed by Dr. Lipton's testimony. *See **Hubbard ex rel. Hubbard v. McDonald's Corp.**, 41 So. 3d 670, 678 (Miss. 2010) ("a qualified medical expert is permitted to extrapolate causation testimony from the patient's clinical picture" under Mississippi's standards for admission of expert testimony).

11

¶31. We find that Dr. Gonzalez's testimony was proper under Rules 702 and 703 of the Mississippi Rules of Evidence. The trial court sustained a number of objections from the defense regarding questions from the Plaintiff that strayed outside Dr. Gonzalez's expertise. Here, Defendants cite no specific testimony from Dr. Gonzalez that was submitted at trial over their objection.

### III. Whether the jury's verdict is inconsistent with the overwhelming weight of evidence.

¶32. Defendants contend that the jury's verdict was the result of substantial bias, passion, and prejudice. They submit that this is evidenced by the jury's completely disregarding unrebutted objective medical evidence from the defense that Cameron's cord arterial blood gas values showed adequate fetal oxygenation during labor and delivery and was not acidotic during labor and delivery. They argue that Dr. Gonzalez readily agreed on cross-examination that arterial blood pH is "a good medical standard for determining the level of fetal oxygenation during labor and delivery." Dr. Gonzalez also acknowledged that Cameron's cord arterial blood pH of 7.22 at delivery was "a normal determination." And he also agreed that Cameron's other cord arterial blood gas measurements, including the partial pressure of oxygen of 19, the partial pressure of carbon dioxide of 46, and a bicarb of 19, were all within normal limits, as well.

¶33. Defendants further contend that after the verdict was returned and the jury was released, Defendants met briefly in the grand jury room just outside the entrance to the courtroom. Defense counsel observed Plaintiff, Shae, and Plaintiff's counsel in the hallway just outside the courtroom surrounded by most, if not all, of the jurors, including the jury

12

foreman. Several of the jurors were seen hugging Plaintiff, Shae, and Plaintiff's counsel, and some of the jurors were crying. Defendants contend in their JNOV motion that this posttrial activity was additional evidence that the jury's verdict was heavily influenced by substantial bias, passion, and/or prejudice. The trial court denied Defendants' JNOV motion.

¶34. At the outset, we do not see where in the record or in their JNOV motion that this posttrial activity was ever presented to the trial court. Accordingly, we decline to entertain it on appeal.

¶35. Two high standards of deference apply to a weight-of-the-evidence argument. First, this Court affords the trial court substantial deference to its determination on the weight of the evidence issue and whether to grant a new trial. *Venton v. Beckham*, 845 So. 2d 676, 684 (Miss. 2003). This Court will only reverse a trial court's decision to deny a new trial if the trial court abused its discretion. *Redmond v. State*, 288 So. 3d 314, 316 (Miss. 2020). "A court abuses its discretion by relying on an erroneous or improper statement of the law or by applying improper or erroneous facts." *Id.* (citing *Overton v. State*, 195 So. 3d 715, 725 (Miss. 2016)). "We therefore review any legal conclusions to ensure the proper law was applied and any factual conclusions to ensure the decision was supported by evidence." *Id.*

¶36. Second, this Court gives "great deference" to the jury verdict itself. *Venton*, 845 So. 2d at 684 (quoting *Wal-Mart Stores, Inc. v. Johnson*, 807 So. 2d 382, 389 (Miss. 2001)). In doing so, this Court must resolve "all conflicts in the evidence and every permissible inference from the evidence in the appellee's favor." *Id.* (quoting *Johnson*, 807 So. 2d at 389). When evidence and testimony conflict, this Court is required to defer to the jury's

13

determination of credibility of the witnesses and weight of the evidence. *Id.* A jury verdict may therefore only be disturbed if it creates an unconscionable injustice. *Id.*

¶37. Defendants argue that the normal umbilical cord gas levels at birth prove unequivocally that the baby did not suffer the hypoxic injury during labor. Defendants maintain a theory that the baby must have suffered meningitis in the days shortly before labor, which caused the injury.

¶38. Dr. Gonzalez testified that a normal umbilical cord gas level can occur even when hypoxia during labor occurs. Plaintiff points to the fact that the standards relied on by Defendants' expert note that "[t]he present of metabolic acidemia does not define the timing of the onset of the hypoxic event." And they note the deposition testimony by Dr. Lipton that hypoxic events can be followed by periods of recovery and that repeated hypoxic events can exacerbate injury. Additionally, Dr. Lancaster, the only testifying doctor who had actually treated Cameron, testified that his presentation was not consistent with meningitis, refuting Defendants' theory and leaving Dr. Gonzalez's explanations to fill the void.

¶39. We find that this is a classic case of conflicting evidence that must be left to the jury to weigh and resolve. An evidentiary close call cannot be said to sanction an unconscionable injustice, nor is it against the *overwhelming* weight of the evidence. Additionally, this Court must defer to the jury as the trier of fact and to the trial court's determination regarding whether to grant or deny a new trial, unless its factual conclusions were unsupported by the evidence.

¶40. Here, the jury found in favor of Plaintiff. And the trial court determined that the jury verdict was not against the overwhelming weight of the evidence and denied Defendants' motion for a new trial. We find no error in the trial court's decision to deny Defendants' motion for a new trial.

## CROSS-APPEAL

**Whether the trial court committed error by reducing the amount of the jury's verdict for noneconomic damages to $500,000.**

¶41. The jury awarded $2,538,322 in noneconomic damages. The trial court reduced the award to $500,000, stating: "Pursuant to applicable law, the [c]ourt is required to reduce the jury's award of non-economic damages to Five Hundred Thousand Dollars ($500,000.00) over the objection of the Plaintiff.'" The trial court continued:

> Section 11-1-60(2)(a), Miss. Code Ann., limits non-economic damages in medical malpractice cases to $500,000.00 for actions filed on or after September 1, 2004. However, the statute existing prior to the passage of the current statute also limited non-economic damages to $500,000.00 for actions filed on or after October 8, 2002. It is undisputed that this civil action was filed on or after October 8, 2002, and before the enactment of the present version of the statute. Therefore, the Motion to Alter or Amend should be denied.

¶42. On October 8, 2002, the Mississippi Legislature passed, and the governor signed, the Medical Malpractice Tort Reform Act (MMTRA), with a general enacting clause stating, "This act shall take effect and be in force from and after January 1, 2003, and shall apply to all causes of action filed on or after that date." H.B. 2, 3d Extraordinary Sess., 2002 Miss. Laws ch. 2.

15

¶43.   As originally adopted, Section 11-1-60(2) of the MMTRA read, in pertinent part, as follows:

> (2)(a) In any action for injury based on malpractice or breach of standard of care against a provide of health care, including institutions for the aged or infirm, in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than the following for non-economic damages:
>
> > (i) For Chapter 2, Third Extraordinary Session 2002, claims for causes of action *filed on or after passage of, but before July 1, 2011*, the sum of Five Hundred Thousand Dollars ($500,000.00);

Miss. Code Ann. § 11-1-60(2)(a) (Supp. 2003) (emphasis added).

¶44.   In 2004, while the present case was still pending, the Mississippi Legislature revised Section 11-1-60 to read as follows:

> (2)(a) In any cause of action *filed on or after September 1, 2004*, for injury based on malpractice or breach of standard of care against a provider of health care, including institutions for the aged or infirm, in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than Five Hundred Thousand Dollars ($500,000.00) for non-economic damages.

Miss. Code Ann. § 11-1-60(2)(a) (Supp. 2004) (emphasis added).

¶45.   Plaintiff contends on cross-appeal that because of the 2004 amendment to Section 11-1-60 and because this action was filed in December 2002, this action is outside the scope of the original statute.  Thus, the trial court erred by reducing the noneconomic-damages award to $500,000.  Plaintiff cites the following rule in furtherance of her argument:

> Many decisions in this state have affirmed the rule, which generally prevails, that the effect of a repealing statute is to abrogate the repealed statute as completely as if it had never been passed, and that a statute modifying a previous statute has the same effect as though the statute had all the while previously existed in the same language as that contained in the modified

16

statute, unless the repealing or modifying statute contains a saving clause. . . .

The result of this rule is that every right or remedy created solely by the repealed or modified statute disappears or falls with the repealed or modified statute, unless carried to final judgment before the repeal or modification, – save that no such repeal or modification shall be permitted to impair the obligation of a contract or to abrogate a vested right.

*Deposit Guar. Bank & Tr. Co. v. Williams*, 193 Miss. 432, 9 So. 2d 639 (1942) (citations omitted); *see also* *Cellular S., Inc., v. Bellsouth Telecomms., LLC*, 214 So. 3d 208 (Miss. 2017); *Bell v. Mitchell*, 592 So. 2d 528 (Miss. 1991); *Stone v. Indep. Linen Serv. Co.*, 212 Miss. 580, 55 So. 2d 165, 168 (1951).

¶46. Plaintiff contends that the right or remedy (limiting noneconomic-damage awards) within Section 11-1-60 was created solely by the enactment of that statute. *See* H.B. 2, 3d Extraordinary Sess., 2002 Miss. Laws ch. 2, § 7. She submits that its adoption was in derogation of the common law, which committed the determination of noneconomic damages to the jury, subject only to the court's limited authority to grant additurs or remittiturs. Plaintiff argues that the present version of the statute that existed at the time of final judgment in this action, the 2004 revision, contains no savings clause staying its effect as to causes pending at the time of its enactment. By the express terms of the statute, Plaintiff contends, a reduction in damages in the present action is not required.

¶47. Plaintiff further argues that Defendants had no vested rights under the previous versions of the statute because Section 11-1-60 is a statute related to remedies, and Mississippi law states that a party has no vested right in or to a remedy prior to entry of final judgment. *Cellular S.*, 214 So. 3d 208.

17

¶48. Defendants contend that the 2002 MMTRA and subsequent revisions demonstrate that a $500,000 cap on noneconomic damages in medical-malpractice cases began on October 8, 2002, and has continued to the present day. Defendants argue that the 2004 revisions merely reaffirmed this rule. By passing the law in 2002, the Legislature clearly intended that any medical-malpractice case filed from October 8, 2002, to July 1, 2011, had a noneconomic-damages cap of $500,000 and that one of the primary purposes of the 2004 amendment was to remove the stepped-up economic-damage caps for cases filed after July 1, 2011. Defendants submit that there is no indication that the Legislature intended their actions in 2004 to create a scenario in which no cap on noneconomic damages existed for cases filed from October 8, 2002, to September 2, 2004. If that was the intent, Defendants argue, then the Legislature could have expressly repealed the cap for cases that were filed between October 8, 2002, and September 2, 2004.

¶49. Defendants cite this Court's decision in *Estate of Gibson*, 91 So. 3d 616, in which a wrongful-death suit against a nursing home was filed on August 25, 2004, and the trial did not occur until 2009. The jury rendered a verdict of "$1.5 million in compensatory damages, which the trial court reduced to $500,000 for non-economic damages and $75,000 for permanent disfigurement." *Id.* at 620. This Court affirmed the reduced judgment of $575,000. *Id.* This Court acknowledged the former statute in place when the complaint was filed, noting:

> At the time the complaint was filed on August 25, 2004, Section 11-1-60 provided that "the term 'noneconomic damages' shall not include damages for disfigurement." H.B. 2, Miss. Laws 3rd Ex. Sess. Ch. 2 § 7 (2002) (emphasis added). In 2004, the definition of noneconomic damages was amended to

18

include disfigurement. H.B. 13, Miss. Laws 1st Ex. Sess. Ch. 1 § 2 (2004). That amendment applied to causes of action filed on or after September 2, 2004. *Id.* at § 20; *see* Miss. Code Ann. § 11-1-60 (Supp. 2011).

*Id.* at 621 n.1.

¶50. Defendants contend that *Estate of Gibson* shows that this Court found that the version of Section 11-1-60 that was in place between October 8, 2002, and September 2, 2004, applied even when the trial occurred in September 2004. Defendants submit that, while *Estate of Gibson* chiefly addressed the issue of disfigurement, *Estate of Gibson* also affirmed the application of the noneconomic-damages cap in a situation procedurally identical to the instant matter.

¶51. *Estate of Gibson* is not applicable or controlling in case before us, as the issue here was not raised and properly addressed by this Court in *Estate of Gibson*. We agree with Plaintiff that the rule reiterated in *Williams* applies here: the 2004 amendment to Section 11-1-60 does not contain a saving clause. September 1, 2004, was the effective date of the statute, thus exempting the present case from the noneconomic-damages cap.

¶52. Before the passage of Section 11-1-60, no medical-malpractice noneconomic-damages cap existed. Absent Section 11-1-60, the present action is governed under Mississippi Code Section 11-7-13 (Rev. 2019), which covers wrongful-death actions. Section 11-7-13 contains no cap for recovery on noneconomic damages. Accordingly, we find that the trial court erred by reducing the jury's noneconomic-damages award.

## CONCLUSION

19

¶53.   We affirm the trial court's denial of Defendants' motion for a JNOV.  We affirm the trial court's denial of Defendants' motion for a new trial based on the weight of the evidence. But we find that the trial court erred by reducing the jury's noneconomic-damages award, given that this action was filed before September 1, 2004, the date the amended version of Section 11-1-60(2)(a) went into effect.

¶54.   **ON DIRECT APPEAL: AFFIRMED. ON CROSS APPEAL: REVERSED AND REMANDED.**

**KITCHENS AND KING,  P.JJ., CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN AND MAXWELL, JJ.  RANDOLPH, C.J., NOT PARTICIPATING.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶55.   Dr. Gonzalez was not qualified to offer expert opinion testimony about the timing and cause in fact of the hypoxic ischemic encephalopathy (HIE). Also, there was no expert-witness testimony to establish the appropriate standard of causation.

¶56.   Dr. Gonzalez is an OB-GYN and maternal fetal-medicine specialist who served as the Plaintiff's only standard-of-care witness.  In pretrial motions and at trial,  Dr. Gonzalez's qualifications and testimony were challenged as to his opinions on the timing and cause in fact of Cameron's HIE.  None of the other six physicians who testified at trial supported the causation theory that Cameron's HIE would have been avoided had a C-section been performed at approximately 7:00 a.m.

¶57.   During his deposition and again at trial, Dr. Gonzalez testified that, as an OB-GYN, he *does not consider himself to have the appropriate expertise to offer qualified opinion testimony about the timing and cause in fact of HIE*.  Dr. Gonzalez said that he had to rely

20

on the testimony of Plaintiff's neuroradiology expert, Dr. Lipton, to determine when the HIE developed. Since Dr. Lipton's opinions were inconclusive, they provided no reliable support for Dr. Gonzalez's conclusory assumptions. Therefore, the trial court abused its discretion and committed reversible error by allowing Dr. Gonzalez to offer causation opinion testimony as to the timing and cause in fact of the HIE at trial over Defendants' objections.

¶58.    In *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31, 35-40 (Miss. 2003), this Court adopted *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and set the standard for admissibility of expert testimony. Mississippi Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

¶59.    The trial court bears the role of gatekeeper in determining the admissibility of expert-witness testimony. *Watts v. Radiator Specialty Co.*, 990 So. 2d 143, 146 (Miss. 2008). Rule 702 provides that it is "necessary for a trial court to apply a two-pronged inquiry when evaluating the admissibility of expert testimony: (1) is the witness qualified, and (2) is the testimony relevant and reliable?" *Id.* at 146 (citing *McLemore*, 863 So. 2d at 35). The party offering the expert testimony bears the burden of proving that the expert's testimony satisfies

the requirements for admissibility. *McLemore*, 863 So. 2d at 36 ("The party offering the expert's testimony must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculations." (citing *Daubert*, 509 U.S. at 590)). When evaluating the admissibility of expert testimony, a trial court must examine "the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara*, 908 So. 2d 716, 723 (Miss. 2005) (internal quotation mark omitted) (quoting *McLemore*, 863 So. 2d at 37).

¶60.    An expert's opinion testimony must be limited to the scope of the expert's qualifications. *Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986, 992 (Miss. 2012). When a physician expert, like Dr. Gonzalez, is only qualified to express some but not all of the opinions offered, the proper remedy is to exclude those opinions that fall outside the scope of the expert's qualifications. *Id.* at 995-99. "[W]hile this Court has said 'a specialist in a particular branch within a profession will not be required,' we have gone on to say, '*[o]nly* if the witness possesses scientific, technical, or specialized knowledge on a particular topic will he qualify as an expert on *that* topic.'" *Worthy v. McNair*, 37 So. 3d 609, 616 (Miss. 2010) (second alteration in original) (quoting *Sheffield v. Goodwin*, 740 So. 2d 854, 856 (Miss. 1999)).

¶61.    In *Robinson*, this Court held that while the trial court appropriately allowed an internist with a subspecialty in pulmonology to offer opinion testimony within the fields of his expertise, it committed reversible error by allowing him to express the opinion that the

subject fall was the cause of the plaintiff's need for a hip replacement, "which was outside his area of expertise." ***Robinson***, 98 So. 3d at 998. The plaintiff's expert internist testified at trial that his relevant expertise was limited to diagnosing hip problems and referring those patients to orthopedic surgeons for further evaluation and treatment. ***Id.*** at 990, 992. He also admitted that "he was not a specialist in orthopedic surgery" and was not qualified "to render a final opinion regarding [the plaintiff's] need for the surgery." ***Id.*** at 994. Based on this testimony, the Court held that the physician's opinions regarding the cause of the need for the hip replacement should have been excluded:

> [The plaintiff's expert internist] certainly was qualified to opine regarding diagnosing a hip problem, referring a patient to an orthopedic surgeon, or other evaluations made from the standpoint of a primary-care or internal-medicine physician. Beyond that, [the plaintiff's expert internist] was not qualified to offer expert testimony regarding whether the fall at Bailey Lumber was the cause of [the plaintiff's] need for a hip replacement. The trial court erred in allowing [the plaintiff's expert internist] to offer expert testimony outside the areas in which he was qualified.

***Id.***

¶62. Here, the trial court erred by allowing Dr. Gonzalez to offer opinion testimony regarding the timing and cause in fact of the HIE. Dr. Gonzalez admitted that he was not qualified to offer expert opinions on these topics. As a result, Dr. Gonzalez's opinions on causation failed to satisfy the admissibility requirements of Mississippi Rule of Evidence 702. The trial court should have prohibited Dr. Gonzalez from offering any medical-causation opinion testimony regarding the timing and cause in fact of the HIE at trial.

¶63. In his deposition, Dr. Gonzalez stated that the "primary thrust" of his testimony would be on the standard-of-care issues and reiterated that "it's my understanding that there are

23

neurologists and other people that will be testifying in a more in-depth way to causation than myself." On the critical issue of determining when the HIE developed, Dr. Gonzalez testified unequivocally that "I do not pertain or put myself out to be an expert in terms of timing, or reading these studies or anything like that." In fact, Dr. Gonzalez agreed that he would defer to other specialists to determine when the HIE developed: "In my opinion, the injury occurred in labor or it was aggravated by allowing the labor to continue and not performing a Cesarean section, *but as to expertise I defer to a pediatric neurologist or a neuroradiologist*, whoever the appropriate expert is." (Emphasis added.) When asked if he had any opinion as to what degree, if any, labor and delivery aggravated a preexisting condition, Dr. Gonzalez disclaimed any expertise to offer such an opinion: "*No*, I cannot quantitate that. If there was a preexisting injury, in my opinion, the labor and delivery process aggravated it, but I cannot sit here -- *I do not have the expertise to say what that percentage aggravation would be*." (Emphasis added.)

¶64. Despite Dr. Gonzalez's admission that he lacked expertise on these topics, the trial court denied Defendants' ***Daubert*** motion to exclude Dr. Gonzalez's testimony. Further, the trial court did not address Defendants' claims that Dr. Gonzalez conceded that he was not qualified to offer any opinions as to the specific cause or timing of the HIE.

¶65. Then, during voir dire, Defendants again challenged Dr. Gonzalez's qualifications to offer opinion testimony regarding the cause in fact and timing of the HIE, which pediatric specialists diagnosed on the third day of Cameron's life. Dr. Gonzalez admitted that he was not trained in pediatrics, pediatric neurology, or neonatology, which represent the pediatric

24

specialties that care for children with medical conditions, like these, immediately after birth. Dr. Gonzalez also conceded that his involvement in the baby's care ends "the moment they're born," and the actual diagnosis and ruling-in and ruling-out of potential causes of HIE is performed by those specialists who care for the baby after birth:

> Q. Okay. And I'll grab your deposition here in a moment if I need to, Dr. Gonzalez, and it was a question that we discussed at your deposition. I'll ask it again.
>
> When it comes to ruling out and ruling in potential causes of hypoxic-ischemic encephalopathy, that ruling in and ruling out process is done by pediatricians, neonatologists, and pediatric neurologists, is that correct?
>
> A. Yes, sir. Ultimately it's their diagnosis. It's their patient, and they're the ones who make the diagnosis, yes, sir.

¶66. Dr. Gonzalez also agreed that as an OB-GYN and maternal fetal-medicine specialist, he does not evaluate newborns for conditions like sepsis nor does he evaluate cerebral-spinal-fluid samples. In fact, he readily agreed that he deferred to the pediatric specialists for those evaluations. Finally, Dr. Gonzalez again acknowledged that he was not an expert on the issues of interpreting imaging studies and timing of neurological injuries in newborns:

> Q. Okay. And when it comes to interpreting image studies on the issues of the extent of neurological injury and the timing of neurological injury, again, you told me at your deposition that you defer and rely on the specialties of neuroradiology and pediatric neurology to correctly interpret and correctly time the injuries that are identified in those studies. Isn't that true?
>
> A. Yes.

¶67. Dr. Gonzalez's testimony about the limitations of his expertise established that he was not qualified to offer expert opinion testimony regarding the timing or cause in fact of the

25

HIE. While he may have been qualified to opine regarding the standard of care owed by Dr. Weber, it is abundantly clear from his own testimony that his qualifications and expertise did not permit him to offer opinions regarding the timing and cause in fact of HIE.

¶68.    Although Dr. Gonzalez relied on the testimony of Plaintiff's neuroradiology expert, Dr. Lipton, as the basis for any assumption that the HIE developed during the final six hours of labor and delivery, Dr. Lipton's opinions were inconclusive.  Indeed, Dr. Lipton clearly testified that he was only able to determine that the HIE developed sometime within a three-day window and repeatedly acknowledged that it was impossible for him to determine whether the HIE developed within a period of hours during labor and delivery.  Thus, Dr. Gonzalez's reliance on Dr. Lipton's inconclusive opinion clearly reveals that Dr. Gonzalez's opinion that the HIE developed during the final six hours of labor and delivery was unreliable and inadmissible. *See, e.g.*, **Worthy**, 37 So. 3d at 616-17 ("Not only was [the OB-GYN expert] testifying outside his particular discipline, but the [autopsy] report on which he rested his opinion reached an inconclusive result.").

¶69.    The trial court overruled Defendants' objections to limit Dr. Gonzalez's testimony to the standard-of-care issues. The trial court's failure to limit the scope of Dr. Gonzalez's testimony consistent with the admitted boundaries of his expertise as required by Rule 702 was an abuse of discretion. The trial court committed reversible error by holding that Dr. Gonzalez was qualified to offer opinion testimony regarding the cause in fact and timing of the HIE. Thus, the admission of Dr. Gonzalez's opinion testimony in this regard constitutes clear, reversible error.

¶70.   "[I]t is illogical to allow a proposed expert to testify as to the standard of care of a specialty with which he has demonstrated no familiarity." *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 182 (Miss. 2009) (internal quotation marks omitted) (quoting *Hubbard v. Wansley*, 954 So. 2d 951, 958 (Miss. 2007)). "[I]f a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1203 (Miss. 2012) (internal quotation mark omitted) (quoting *Catchings v. State*, 684 So. 2d 591, 597 (Miss. 1996)). "[A] plaintiff may not use inadmissible evidence to establish the standard of care, or that a medical provider failed to comply with that standard of care." *Cleveland v. Hamil*, 119 So. 3d 1020, 1024 (Miss. 2013).

¶71.   Next, to establish causation, the jury had to find that a C-section at 7:00 a.m. would have provided Cameron with a "greater than 50% chance of a substantially better outcome." *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 527 (Miss. 2019). The Plaintiff did not even address this critical issue. There was no expert-witness testimony as to the appropriate causation standard of "greater than 50 percent chance of a substantially better outcome." Not one of the seven physicians who testified at trial were able to reliably conclude, either individually or in combination, how much, if any, of Cameron's HIE occurred during the relevant six hours between 7:00 a.m. and delivery at 1:10 p.m. while under Dr. Weber's care.

¶72.   Dr. Gonzalez testified that Cameron had been experiencing ongoing, cumulative HIE for at least several hours before 7:00 a.m. In addition, Dr. Gonzalez testified that he cannot

27

say when the brain injury occurred, how fast it progressed, or when Cameron's condition became unrecoverable; his causation testimony provided no support for the jury's verdict.

¶73. In a medical-negligence case, "proximate cause requires more than speculation, guesswork, conjecture, or inferences. The law requires probability, not an assumption . . . ." *Martin v. St. Dominic-Jackson Mem'l Hosp.*, 90 So. 3d 43, 50 (Miss. 2012) (affirming directed verdict for defendant hospital because plaintiff's expert testimony was insufficient to satisfy the causation element). The same standard applies outside of medical negligence claims. In *Double Quick, Inc. v. Lymas*, 50 So. 3d 292, 299 (Miss. 2010), this Court reversed a jury verdict for the plaintiff that arose out of a shooting in a convenience store parking lot and rendered judgment for the defendant because the plaintiff's experts' testimony "resulted in the jury's having been left to speculate and guess about causation." *Id.* This Court ruled, "[w]hile we view the evidence in the light most favorable to the verdict, speculation and conjecture alone will not support a verdict." *Id.*

¶74. In this case, Plaintiff only presented expert testimony on causation during the window described as "during labor and delivery." This creates the absence of causation evidence to establish Dr. Weber's negligence. Viewing the evidence in the light most favorable to the verdict, no admissible evidence  proved Plaintiff's theory that a C-section at 7:00 a.m. "would have produced a greater than 50% chance of a substantially better outcome."

¶75. Instead, the evidence established that Hill went into labor at approximately 2:30 a.m. on November 23, 2001. She arrived at SCRMC shortly thereafter, and electronic fetal monitoring began at 3:55 a.m. Hill was formally admitted to the labor and delivery floor at

28

around 5:00 a.m. Dr. Weber arrived approximately 7:00 a.m., which is also when Dr. Gonzalez contends the standard of care required him to perform a C-section. Cameron was delivered at 1:10 p.m. that afternoon.

¶76.  Dr. Gonzalez testified that Cameron had been experiencing HIE since before Hill's arrival at SCRMC that morning. Dr. Gonzalez was asked about Cameron's condition on Ms. Hill's arrival at SCRMC during the early morning hours, and Dr. Gonzalez responded, "the baby was in trouble from the beginning." He continued, "if you look at the tracing, it's clearly abnormal from the get-go."  Dr. Gonzalez then added:

> Q:  And despite all the research and experience in labor and delivery problems, is it possible for an obstetrician to make a judgment as to how long it's safe to allow a baby who is showing signs of distress to continue down the normal labor course?
>
> A:  No. Once you're seeing that there is signs, okay, that there's a risk, you have no way of knowing. You need to get that baby out as quickly as possible.  Certainly hours is out of the question.
>
> Q:  There's no way to judge how quickly that injury might be progressing?
>
> A:  No. I have no way of telling that. That's where all of that other business comes in of imaging and neuroradiologists, and they start looking and they start trying to figure out, okay, this happened, you know, a day ago, two or three hours ago, an hour, whatever. Okay? That's their purview. They're the ones that can look at it and then decide when this injury happened. I can't do that. I don't have the tools.

¶77.  Dr. Gonzalez only established that (1) Cameron was already experiencing HIE when Hill arrived at the hospital several hours before the standard of care required Dr. Weber to perform a C-section at 7:00 a.m., and (2) additional expert testimony was needed from

29

physicians in other medical specialties to reliably determine the progression and more specific timing of the HIE.

¶78.    Based on Dr. Gonzalez's theory, Cameron's HIE was caused by a combination of "[u]teroplacental insufficiency and cord compression during the labor process." Dr. Gonzalez testified that these two conditions had a cumulative effect on Cameron, which he claims was exacerbated further by the fact that he was diagnosed at birth with intrauterine growth restriction, meaning that his growth had been restricted during the pregnancy because "the placenta was basically not giving the baby everything it needed." Dr. Gonzalez explained that Cameron's intrauterine growth restriction was caused over time by "uteroplacental insufficiency," which means that uteroplacental insufficiency and intrauterine growth restriction, two of Dr. Gonzalez's identified causes of Cameron's HIE, began and continued for a prolonged period well before the onset of labor. Cameron's growth restriction also meant that he was less able to tolerate stressful conditions than an otherwise healthy baby. This testimony clearly established that Cameron was experiencing cumulative HIE due to the combined effects of these three conditions from at least the moment Hill arrived at the hospital in labor, if not earlier.

¶79.    Plaintiff's neuroradiology expert testified that he was only able to determine that the HIE developed sometime within a three-day window and repeatedly acknowledged that it was impossible for him to determine whether the HIE developed within a period of hours during labor and delivery. Neither Dr. Gonzalez nor Dr. Lipton testified that the HIE developed during the final six hours of labor and delivery. Dr. Lipton testified that he was

only able to determine that the HIE developed sometime within a three-day window. The jury's reliance on any testimony otherwise was inappropriate, unreliable, and speculative.

¶80.    The majority does not point to any qualified and reliable expert-witness testimony from which the jury could have legitimately and reasonably inferred the amount of brain injury, if any, that would have been avoided by a C-section at 7:00 a.m. and how that would have impacted the ultimate outcome, if at all. With Dr. Gonzalez's testimony that the HIE began at least several hours before 7:00 a.m. and no other expert witness's testifying about how quickly an injury like Cameron's progressed during labor, how much injury occurred between 7:00 a.m. and delivery at 1:10 p.m., or when the situation became unrecoverable, it is clear that the jury could not have arrived at its verdict without engaging in impermissible speculation and guesswork. "[P]roximate cause requires more than speculation, guesswork, conjecture, or inferences. The law requires probability, not an assumption . . . ." *Martin*, 90 So. 3d at 50. Thus, when viewed in the light most favorable to the verdict, the evidence relied on by Plaintiff was insufficient to support the jury's verdict.

¶81.    Finally, I must consider whether the proper result would be to remand this case for a new trial or render a judgment. This was considered in *Cleveland*, 119 So. 3d 1020. The Court ruled:

> The single issue before us is whether the Court of Appeals erred by remanding for a new trial against Dr. Cleveland, rather than rendering a judgment in his favor. We hold that the Court of Appeals erred by remanding for a new trial.
>
> In order to establish a *prima facie* case of medical malpractice, a plaintiff must prove "(1) the existence of a duty by the defendant to conform to a specific standard of conduct for the

31

protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant."

And to establish the second and third prongs—that the defendant breached the applicable standard of care, and that the breach proximately caused plaintiff's injuries—the plaintiff must provide expert testimony.

We have affirmed grants of summary judgment and directed verdicts in favor of defendants in medical-malpractice actions where the plaintiffs failed to produce a qualified expert. Likewise, we have reversed a trial court's denial of a defendant's motion for directed verdict and rendered judgment in favor of the defendant where the plaintiff's qualified expert failed to testify to a reasonable degree of medical certainty. Relying on this authority, the Court of Appeals properly rendered judgment in favor of Dr. Smith-Vaniz and Jackson HMA.

We find, however, that the Court of Appeals also erred by not rendering judgment in favor of Dr. Cleveland. While Dr. Silverman was qualified as an expert in cardiovascular surgery, his testimony concerning Dr. Cleveland's breach of the standard of care consisted entirely of a new theory that the plaintiff did not disclose. Had the trial judge excluded this testimony—as he should have—the plaintiff would have been without any expert testimony to establish that Dr. Cleveland breached the standard of care.

Medical negligence cases are different from cases that do not call into question the standard of care of a medical provider. While expert testimony may be helpful in non-medical negligence cases, it is not required. But the failure to produce a competent medical expert prohibits the plaintiff from bringing the case to trial. Indeed, in every kind of case, a judgment not withstanding the verdict is generally appropriate where the plaintiff has failed to produce sufficient admissible evidence to establish a prima facie case, and the fact that a trial judge erroneously allows inadmissible evidence into the record—whether expert testimony or otherwise—does not abrogate that rule.

. . . To be clear, a plaintiff may not use inadmissible evidence to establish the standard of care, or that a medical provider failed to comply with that standard of care. Here, the plaintiff's only evidence of Dr. Cleveland's standard of care or breach thereof was inadmissible. Accordingly, it is clear that Dr. Cleveland was entitled to judgment notwithstanding the verdict.

32

*Id.* at 1023-24 (footnotes omitted) (citations omitted).

¶82.    For these reasons, I would reverse and render the judgment of the Circuit Court of Jones County.

**COLEMAN AND MAXWELL, JJ., JOIN THIS OPINION.**